IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | NO. 2:05-CV-50-WCO |
| | : | |
| $26,620.00 IN UNITED STATES | : | |
| CURRENCY, and $868.00 IN | : | |
| UNITED STATES CURRENCY, | : | |
| | : | |
| Defendants. | : | |

## ORDER

The captioned case is before the court for consideration of the United States' motion for summary judgment [22-1]. The United States' motion pertains to the claim filed in this forfeiture proceeding by Larry Smith.

### I.    Factual Background

The facts leading up to this forfeiture action are as follows. On October 21, 2004, Barrow County Sheriff's Deputy Ed Weaver was patrolling in his marked patrol car when he observed a tan Honda Accord brake abruptly after the driver noticed the patrol car. [Pl.'s Statement of Material Facts ¶ 1.] When Deputy Weaver observed the Honda's driver nearly rear-end another car, he activated his emergency lights and stopped the Honda for following too

closely.  [Id. ¶¶ 2-3.] Upon his initial contact with the driver, who identified himself as Larry Rodgers, Deputy Weaver smelled marijuana and noticed that Rodgers had a green leafy substance and ashes on the front of his shirt. [Id. ¶¶ 4-6.] After Deputy Weaver questioned him, Rodgers produced the marijuana from the car's console and admitted to having smoked half of a "joint" an hour before the traffic stop. [Id. ¶¶ 7-8.]

Deputy Weaver requested assistance from other officers at the scene. [Id. ¶ 9.] Lieutenant Mike Hamm arrived and determined, based on the presence of the marijuana, that there was probable cause to search the Honda. [Id. ¶¶ 11-12.] Upon performing a pat-down search of Rodgers, Deputy Weaver found a large amount of United States currency, which he seized as drug proceeds. [Id. ¶ 15.]

In the trunk of the Honda, the officers found a book bag containing a plastic shopping bag. [Id. ¶ 19.] Inside the shopping bag was a pillow case containing a large amount of United States currency that was bundled in stacks, folded, and wrapped with rubber bands. [Id. ¶¶ 19-20.] The officers allowed a trained and certified drug-detection dog, Ranger, to smell the book bag that had contained the currency. [Id. ¶ 41.] Ranger gave a positive alert to the odor of narcotics on or in the book bag. [Id.] The officers also observed marijuana seeds and pieces of marijuana in plain view all over the seats and floorboards of the

Honda. [Id. ¶ 22.] The officers also found two types of ammunition in the Honda's glove box and a loaded .45 caliber handgun under the driver's seat. [Id. ¶ 23.]

The deputies arrested Rodgers and charged him with possession of marijuana, possession of a firearm while committing a crime, and following too closely. [Id. ¶ 24.] They also arrested the two passengers, Shaun Rogers and Elgie Rogers, and charged them with possession of marijuana. [Id.] After being read his Miranda rights, Rodgers stated that they were on their way to a flea market in Atlanta. [Id. ¶¶ 26-27.] Rodgers stated that he purchases clothes at the flea market for resale at three "Fashion Unlimited" store locations that he owns with his father, Larry Smith, claimant in this action. [Id. ¶ 27.] Rodgers, however, could not provide the name or location of the flea market even though he stated that he had been there on four or five previous occasions. [Id. ¶ 29.]

Rodgers told the officers that he was going to stay in Atlanta for three or four days but that he did not know where. [Pl.'s Statement of Material Facts ¶ 32.] Rodgers also stated that he had "about twenty-six or twenty-seven thousand" dollars in the Honda and that all of the currency belonged to him. [Id. ¶ 22.] He also claimed that he did not have any friends or family in Atlanta and that he did not know anyone there. [Id. ¶ 34.] However, during the

interview with the officers, Rodgers received a call on his cellular phone from a telephone number in the Atlanta area. [Id.] Rodgers denied knowing who was calling. [Id.] The two passengers also denied knowing anyone in Atlanta and claimed that they were just going to the flea market with Rodgers. [Id. ¶¶ 36-39.] None of the three men gave the same response when questioned about how long they intended to stay in Atlanta. [Id. ¶¶ 32, 37-38.]

Acting in an undercover capacity using Rodgers' cellular phone, Sergeant David White called the Atlanta area number that had appeared on Rodgers' caller I.D. during the traffic stop. [Id. ¶ 42.] He spoke to Nathaniel Hollis, who asked if he was "on the way and still wanted them" and stated that they were "five hundred each." [Id.] Sergeant White asked Hollis to bring the unidentified delivery to a motel in Braselton, Georgia. [Id.]

When Hollis arrived at the hotel to make the delivery, the officers arrested him and his two companions. [Id. ¶ 43.] One companion admitted that there was marijuana in the trunk of his vehicle, and Hollis admitted that he was going to sell it to "Larry." [Id.] Sergeant White discovered approximately 60 pounds of marijuana in the trunk of Hollis' vehicle. [Id. ¶ 44.]

Later that day, Sergeant White contacted claimant to discuss the large amount of United States currency that the officers found in the Honda. [Id. ¶ 45.]

Sergeant White claims that the call lasted approximately five minutes, but claimant later testified that he received only one call from a police officer that lasted less than 30 seconds. [Id. ¶¶ 45-46.] Sergeant White also claims that claimant told him that Rodgers was going to buy some clothes for him, but claimant later testified that Rodgers was going to buy merchandise for his own business. [Id. ¶ 47.] Sergeant White also testified that claimant first stated that he was unsure of the amount of money that Rodgers had in his possession but that claimant then stated that Rodgers should have between seven and eight thousand dollars. [Id. ¶ 48.] Claimant, however, later testified that he knew that Rodgers was going to take $6,700 from claimant's store and that he did not discuss this amount with Sergeant White. [Id. ¶ 49.]

The officers transported the seized currency to the Bank of America branch office in Winder, Georgia, where a bank employee counted it. [Id. ¶ 50.] The bank employee determined that the currency found in the book bag totaled $26,620.00 and consisted of 40 $100 bills, 6 $50 bills, 1018 $20 bills, 167 $10 bills, and 58 $5 bills. [Id.] The currency found in Rodgers' front pocket totaled $868.00 and consisted of 30 $20 bills, 9 $10 bills, 35 $5 bills, and 3 $1 bills. [Id.]

Claimant is the father of Larry Rodgers and the sole proprietor of Fashions, Ltd., Inc., a retail clothing store in Shelby, North Carolina. [Claimant's

Statement of Material Facts ¶¶ 1, 3.] Claimant was employed as a supervisor earning approximately $60,000 per year at a health-care company from 1992 to 2002. [Id. ¶¶ 52-53; Claimant's Statement of Material Facts ¶¶ 4-5.] Claimant exercised his stock options in 2001 and sold the stock for over $56,000, depositing the proceeds into his account at The Palmetto Bank. [Pl.'s Statement of Material Facts ¶ 58.] In 2002, claimant also deposited approximately $14,000 from cashing in his 401(k) account and approximately $7,000 from the sale of employee stock. [Id.] Claimant's income tax records indicate an adjusted gross income ("AGI") for 2002 of -$13,115 resulting from business losses totaling $67,413. [Id. ¶ 55.] These records also show that his AGI for 2003 was $6,239 and for 2004 was $7,385. [Id.] Claimant testified that he operated Fashions, Ltd. on a part-time basis even while working at the health-care company, but his tax return for 2001 does not indicate any income from the store. [Id. ¶¶ 56, 62.] Claimant testified that his monthly expenses are approximately $1,400 plus automobile insurance. [Id. ¶ 65.]

The records from The Palmetto Bank show that claimant emptied his bank account by writing checks to various parties so that the account became overdrawn by June 2003. [Id. ¶ 59.] Claimant also kept a checking account at Bank of America during 2003. [Id. ¶ 60.] The records from Bank of America

show that claimant emptied his account by writing checks to various parties and that the account became overdrawn by September 2003. [Id. ¶ 61.] Claimant states that he closed his bank accounts and stores most of his cash in the basement of his store. [Claimant's Statement of Material Facts ¶ 10.] He claims that he keeps approximately $35,000 in the basement and that he usually keeps approximately $50,000 stored in separate pillow cases in separate locations. [Id.]

Claimant asserts that he intended to loan his son money to purchase inventory for a new wholesale business. [Id. ¶12.] Claimant states that he had separated approximately $6,700 in cash in a brown satchel for his son. [Id. ¶ 13.] He claims that the remaining amount of approximately $28,000 was left in another location. [Id.] He claims that his son took the "wrong" bag from the basement and took the bag containing approximately $28,000 instead of the one with $6,700. [Id. ¶ 14.] Claimant testifies that his son did this without his permission and that he did not intend to give his son $28,000. [Id.] Claimant, however, has testified that Rodgers did not know how much claimant was loaning him. [Pl.'s Statement of Material Facts ¶ 68.]

Claimant denies knowing that his son would be involved in any controlled substance violation or other illegal activity. [Claimant's Statement of Material Facts ¶ 17.] Claimant also denies giving consent or authorization for his

son to use the money for any illegal transaction. [Id.] Claimant has no arrest record. [Id.]

The government filed this civil forfeiture action on April 13, 2005.  The government now moves for summary judgment.  Claimant has filed a response to this motion, asserting that he is an innocent owner of defendant currency and, therefore, that it is not subject to forfeiture.

## II.    Summary Judgment Standard

Summary judgment shall be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Only those claims for which there is no need for a factual determination and for which there is a clear legal basis are properly disposed of through summary judgment.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

It is well-settled that a court evaluating a summary judgment motion must view the evidence in the light most favorable to the non-movant.  See, e.g., Samples v. City of Atlanta, 846 F.2d 1328, 1330 (11th Cir. 1988).  It is important to recognize, however, that this principle does not require the parties to concur on every factual point.  Rule 56 "[b]y its very terms . . . provides that the mere

existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242, 247-48 (1986).

Consideration of a summary judgment motion does not lessen the burden on the nonmoving party. The nonmoving party still bears the burden of coming forth with sufficient evidence. <u>See Earley v. Champion Int'l Corp.,</u> 907 F.2d 1077, 1080 (11th Cir. 1990). However, it is important to note the difference "between direct evidence and inferences that may permissibly be drawn from that evidence. Where a nonmovant presents direct evidence that creates a genuine issue of material fact, the only issue is one of credibility; thus, there is no legal issue for the court to decide." <u>Mize v. Jefferson City Bd. of Educ.,</u> 93 F.3d 739, 742 (11th Cir. 1996). On the other hand, "[a] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the nonmovant relies, are 'implausible.'" <u>Id.</u> at 743. Adopting language from one of its sister circuits, the Eleventh Circuit stated:

> If the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party. The nonmoving party's evidence must be taken as true. Inferences from the nonmoving party's "specific facts" as to other material facts, however, may be drawn only if they are reasonable in view of other undisputed

> background or contextual facts and only if such inferences are otherwise
> permissible under the governing substantive law.  This inquiry ensures
> that a "genuine" issue of material fact exists for the factfinder to resolve
> at trial.

Id. (citation omitted).  "Where the evidence is circumstantial, a court may grant

summary judgment when it concludes that no reasonable jury may infer from

the assumed facts the conclusion upon which the nonmovant's claim rests."  Id.

### III.    Analysis

In determining whether the government is entitled to forfeiture under 21

U.S.C. § 881(a)(6), the court must apply a number of shifting burdens to the

parties.  A threshold issue is whether the claimant to the property has standing

to contest the forfeiture.  United States v. $38,000.00 in U.S. Currency, 816 F.2d

1538, 1543 (11th Cir. 1983).

### A.    Standing

There are two different forms of standing in a forfeiture case: Article III

standing and statutory standing.  Id.  It is well established that to contest a

forfeiture, a claimant must first demonstrate a sufficient interest in the property

to give him standing such that would confer jurisdiction on this court to

consider his claim.  Id.  A claimant need not own the property to have Article III

standing; a lesser property interest, such as the possessory interest of a bailee,

is sufficient for standing.  Id.  However, the claimant must come forth with some

evidence of his ownership to establish standing to contest a forfeiture. <u>United States v. $38,570 U.S. Currency</u>, 950 F.2d 1108, 1112 (5th Cir.1992) ("a bare assertion of ownership of the <u>res</u>, without more, is inadequate to prove an ownership interest sufficient to establish standing").

Claimant asserts that he is the owner of the currency and that he loaned it to Rodgers. Claimant asserts that, while he agreed to loan Rodgers $6,700.00, he did not agree to loan him the $28,000.00 contained in the bag actually taken by Rodgers. Therefore, claimant argues that he retained ownership of the money taken without his authority.

Claimant contends that his argument is supported by <u>United States v. $260,242.00 U.S. Currency</u>, 919 F.2d 686 (11th Cir. 1990), and <u>United States v. $511,780.00 in U.S. Currency</u>, 847 F. Supp. 908 (M.D. Ala. 1994). Both of these cases, however, address the issue of whether a bailee has a sufficient possessory interest in the defendant property to establish standing to challenge the forfeiture proceeding. Claimant and Rodgers were not acting as bailee and bailor as claimant contends that the currency was taken without his authority. Furthermore, the evidence clearly shows that the currency was seized from Rodgers' vehicle and that claimant was not present at the time of the seizure. Thus, claimant had neither actual nor constructive possession of the money. As

claimant lacked possession of the defendant currency, the cases cited by claimant are inapposite.

Claimant also asserts that he has standing under the theory of constructive trust. Claimant argues that Rodgers obtained the loan from him through fraud because he misrepresented the purpose of the loan. A constructive trust may be imposed when the holder of title acquired the property through fraud, breach of duty, or some other circumstance making it inequitable for the holder to retain the property against the claim of the beneficiary of the constructive trust. See United States v. Real Prop. Located at 5201 Woodlake Drive, 895 F. Supp. 791, 795 (M.D.N.C. 1995). Claimant, however, does not establish any fraud or breach of duty by Rodgers.[1] Furthermore, claimant has not provided any evidence to establish sufficient ownership in the defendant currency for him to be the beneficiary of a constructive trust.

The government contends that claimant lacks standing because he is an unsecured creditor. Claimant has asserted that he gave Rodgers permission to take a bag containing $6,700.00 and that this was a loan. Claimant has admitted,

---

[1] Claimant's assertion that Rodgers defrauded him by taking the "wrong" bag is contradicted by his testimony that Rodgers had no idea how much money claimant was loaning him. [See Pl.'s Statement of Material Facts ¶ 68; Claimant's Statement of Material Facts ¶ 14.]

however, that he did not enter into any written agreement with Rodgers concerning the amount of the loan, the terms of repayment, or a description of the collateral. Thus, claimant is an unsecured creditor. N.C. Gen. Stat. §§ 25-9-203, 45-36.4; S.C. Code Ann. § 36-9-203.[2] As an unsecured creditor, claimant lacks standing to contest the forfeiture of the defendant currency. See 18 U.S.C. § 983(d)(6)(B)(I) (unsecured creditor is specifically excluded from the definition of owner under the innocent owner provision of the statute); see also, United States v. $61,483.00 in U.S. Currency, 2003 U.S. Dist. LEXIS 4614 (W.D. Tex. 2003); United States v. $15,060 in U.S. Currency, 1999 U.S. Dist. LEXIS 3514 (D. Or. 1999).

The only evidence submitted by claimant in support of his assertion of ownership of the money are his tax returns for 2001, 2002, 2003, and 2004 and receipts from the liquidation of his stock options and 401(k) account. Claimant contends that defendant currency was part of $50,000 in cash that he kept in his store after closing his bank accounts. He claims that he received stock options worth over $60,000 and retirement money of about $13,000 from his previous

---

[2] Ownership interests are defined by the law of the state in which the interest arose. Both claimant and Rodgers live in Gaffney, South Carolina and claimant's store, where Rodgers acquired the money, is located in Shelby, North Carolina. Claimant is an unsecured creditor under either South Carolina law, i.e., the location of the debtor (Rodgers), or North Carolina law, i.e., the location of the loan.

employment in the health-care business and that he had approximately $20,000 in his 401(k) account. He also asserts that he earned approximately $60,000 per year at his job in the health care industry until 2002.

The evidence, however, does not support claimant's contentions. Claimant's tax returns show that he had a loss of $13,115 in 2002 and earned only $6,239 in 2003 and $7,385 in 2004. Furthermore, the evidence demonstrates that claimant deposited the money from liquidating his stock options and his 401(k) into a checking account at The Palmetto Bank between August 2001 and October 2002. The evidence also shows that claimant spent all of the funds in this checking account so that it became overdrawn by June 2003. Between April 2001 and April 2003, claimant wrote several checks payable to cash totaling approximately $20,000. The remainder of the money was paid to various other individuals. The evidence also shows that claimant's other bank account at Bank of America was also closed by December 2003 as it was overdrawn. Thus, claimant's bank accounts were closed almost a year before the defendant property was seized from his son's car. Claimant's testimony also demonstrates that his expenses for the past three years exceeded his income. These facts are such that a reasonable juror would find it implausible that claimant would have been able to save over $27,000, much less $50,000, in cash from liquidation of his

14

stock options and retirement savings or from his income over the past few years. Thus, the court concludes that claimant's evidence does not support his claim of ownership in the defendant property.

Here, assuming that claimant did loan the money to his son, the court finds claimant's status to be that of a general creditor, and, as such, he cannot assert a legal right to a portion of the defendant property. The mere allegation that he is the owner of the $26,620 is insufficient. See Kadonsky v. United States, 216 F.3d 499, 508 (5th Cir. 2000) (holding that claimant's unsupported assertion of ownership is insufficient to establish standing to challenge the forfeiture action). Furthermore, claimant's financial records fail to establish that he could have possessed over $27,000 in cash. Although claimant contends that the evidence of his stock options and retirement money support his assertion of ownership of a large amount of cash, the financial records show that the money was spent a full year before the seizure of the defendant property. Thus, the court concludes that claimant has failed to demonstrate ownership sufficient to confer upon him standing to contest the forfeiture.

### B. Merits of the Case

Although the court has found that claimant lacks standing, the court will address the merits of the case. In a civil forfeiture action under 21 U.S.C. §

881(a)(6), the government must show by a preponderance of the evidence[3] that

the property is subject to forfeiture and that there is a substantial connection

between the property and an illegal drug transaction.  18 U.S.C. § 983(c); United

States v. $242,484.00 in U.S. Currency, 389 F.3d 1149, 1160 (11th Cir. 2004).  The

government does not need to produce direct evidence of a connection between

the property and drug activity; rather, the government may rely upon

circumstantial evidence to meet its burden of proof. $242,484.00, 389 F.3d at

1160.  In attempting to meet its burden, the government may use evidence

"gathered after the filing of a complaint for forfeiture to establish . . . that [the]

property is subject to forfeiture."  18 U.S.C. § 983(c).  Finally, in evaluating the

evidence in a civil forfeiture proceeding, the court must use a "common sense

view of the realities of normal life applied to the totality of the circumstances"

instead of viewing the evidence with "clinical detachment."  United States v.

Carrell, 252 F.3d 1193, 1201 (11th Cir. 2001).

The government argues that the defendant property is subject to forfeiture

due to its connection to illegal narcotics.  Under 21 U.S.C. § 881(a)(6), the

---

[3] Prior to the enactment of the Civil Asset Forfeiture Reform Act ("CAFRA"), the government was required to establish only probable cause to believe that the property was subject to forfeiture.  See 19 U.S.C. § 1615.  For all cases commenced after August, 23, 2000, however, the government must prove its case by a preponderance of the evidence.  See 18 U.S.C. § 983(c).

government may obtain forfeiture of money furnished or intended to be furnished in exchange for a controlled substance, all proceeds traceable to such an exchange, and all money used or intended to be used to facilitate such an exchange.  After reviewing the evidence in this case, the court finds that the government has met its burden of proof in establishing by a preponderance of the evidence that defendant property is subject to forfeiture because of its connection to an illegal drug transaction.

The evidence demonstrates that Rodgers was carrying $26,620 and $868 in United States currency,[4] an amount far greater than what is carried by most law-abiding citizens.  See U.S. v. $22,991.00, More or Less, in U.S. Currency, 227 F. Supp. 2d 1220, 1232 (S.D. Ala. 2002).  For purposes of a civil forfeiture action, the possession of a large sum of cash is strong evidence of narcotics trafficking. U.S. v. One Lot of U.S. Currency ($36,634.00), 103 F.3d 1048, 1055 (1st Cir. 1997); see also, U.S. v. $ 2,361.00 U.S. Currency, More or Less, 1989 U.S. Dist. LEXIS 12855, *2 (S.D.N.Y. 1989) (a substantial amount of cash present is probative of

---

[4] The evidence also shows that Rodgers was contacted by Nathaniel Hollis, who later admitted that he planned to sell 60 pounds of marijuana to "Larry" at "five hundred each."  Thus, the testimony indicates that Rodgers had arranged to purchase $30,000 worth of marijuana, an amount close to the defendant currency.

illegal drug activity, because it is "well-known that drug-traffickers usually deal in cash").

The manner in which Rodgers was carrying the money further indicates a connection to illegal drug activity. The evidence shows that Rodgers was carrying bundles of currency folded and wrapped with rubber bands inside a pillow case that was placed inside a shopping bag. The shopping bag was then placed inside a book bag. The fact that the money was concealed and bound by something other than the standard currency wrappers used by banks indicates that it is connected to drug trafficking. See $242,484.00, 389 F.3d at 1161 ("[a] common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages in a backpack . . . because there are better, safer means of transporting cash if one is not trying to hide it from the authorities"). Furthermore, claimant has offered no evidence suggesting an innocent reason for packaging defendant currency in this manner.

The government has also presented evidence that defendant currency was found in the same vehicle as marijuana and that the officers involved in Rodgers' traffic stop found marijuana seeds and residue in plain view on the seats and floors of the vehicles. Furthermore, "Ranger," a trained narcotics

detection dog, alerted to the odor of narcotics on the book bag in which defendant currency was discovered.  For purposes of a civil forfeiture action, a large amount of money found in close proximity to drugs or drug paraphernalia is evidence of drug trafficking.  See U.S. v. $10,700 in U.S. Currency, 258 F.3d 215, 224 (3d Cir. 1992).  Also, the positive alert of a certified drug detection dog may be considered by the court in weighing the totality of the evidence in a civil forfeiture action.  See $22,991.00, 227 F. Supp. 2d at 1233.

The government has also offered evidence that Rodgers and his passengers made inconsistent and implausible statements to the officers present at the time of the seizure.  Although Rodgers claimed to be traveling to a flea market, he could not provide the name or location despite his statement that he had been there on four or five previous occasions.  Shaun Rogers was unsure of where he was traveling with Rodgers.  Also, the three passengers in the Honda offered inconsistent statements about their planned stay in Atlanta.  Although all three denied knowing anyone in Atlanta, during his interview, Rodgers received a telephone call from an Atlanta area telephone number.  Furthermore, when Sergeant White phoned claimant, he received answers that were inconsistent with those provided by Rodgers.  These inconsistent statements are additional evidence that the money was related to drug trafficking.  See U.S. v.

$37,780 U.S. Currency, 920 F.2d 159, 163 (2d Cir. 1990); see also, $22,991, 227 F. Supp. 2d at 1235.

The government has also presented evidence implicating Rodgers in drug activities. At the traffic stop, Rodgers admitted that he had a small amount of marijuana in his possession. During a search of his vehicle, the officers discovered two types of ammunition and a loaded .45 caliber handgun in addition to defendant currency. The officers also arranged a delivery from Hollis, who had called Rodgers' cellular phone. The delivery turned out to be approximately 60 pounds of marijuana that Hollis intended to sell to "Larry."

Finally, claimant's evidence of legitimate income does not sufficiently explain the $26,620 and $868 in cash. "The mere allegation of a highly unlikely legitimate source of income without some support to give the allegation credibility cannot constitute an issue of material fact defeating summary judgment for forfeiture." U.S. v. Two Parcels of Real Property Located in Russell County, Ala., 92 F.3d 1123, 1129 (11th Cir. 1996). Also, if the claimant's only evidence of a legitimate source for the seized currency is so implausible that no reasonable jury could find for claimant, the court may grant summary judgment for the government. See U.S. v. $86,020.00 in U.S. Currency, 1 F. Supp. 2d 1034, 1040-41 (D. Ariz. 1997). As discussed above, claimant's contention that

20

defendant currency was part of the $50,000 in cash that he kept in his store is implausible.  Even if the court could find that claimant has shown sufficient proof of ownership of defendant currency, the financial information submitted by claimant does not support the argument that such cash was obtained through legitimate earnings.

Taking into account the totality of the circumstances, the evidence supports the government's position that the property is subject to forfeiture. The absence of a plausible legitimate source for a large amount of cash, coupled with the other evidence in this case, strongly suggests that defendant currency was related to illegal drug activity.  The court, therefore, finds that the government has shown by a preponderance of the evidence that the property is subject to forfeiture.

### C.    Claimant's Assertion of Innocent Owner Defense

Claimant is contesting the forfeiture, asserting the innocent owner defense as set forth in 18 U.S.C. § 983(d).  The term "innocent owner" means an owner who either "did not know of the conduct giving rise to forfeiture" or "upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property."  18 U.S.C. § 983(d)(2)(A).  A claimant asserting this defense has the burden of

proving that he is an innocent owner by a preponderance of the evidence.  Id.
§ 983(d)(1).  Claimant asserts that he did not know that Rodgers intended to use
the money to purchase drugs.

As claimant has failed to prove ownership of defendant property, he is
not entitled to assert the innocent owner defense.  Claimant lacks standing to
assert this defense as he cannot show that he has any interest in the property
other than that of an unsecured creditor.  See 18 U.S.C. § 983(d)(6)(B) (definition
of "owner" does not include "a person with only a general unsecured interest
in, or claim against, the property or estate of another").

**IV.   Conclusion**

Based on the foregoing, plaintiff's motion for summary judgment is
hereby **GRANTED** [22-1].

IT IS SO ORDERED, this 12th day of April, 2006.

s/ William C. O'Kelley

WILLIAM C. O'KELLEY
Senior United States District Judge